IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MELANIE K. LUNDSTRUM, | ) | CASE NO. 5:22-CV-02165-CEH |
| | ) | |
| Plaintiff, | ) | CARMEN E. HENDERSON |
| | ) | UNITED STATES MAGISTRATE JUDGE |
| v. | ) | |
| | ) | MEMORANDUM OF OPINION & |
| COMMISSIONER OF SOCIAL SECURITY, | ) | ORDER |
| | ) | |
| Defendant, | ) | |
| | ) | |

**I. Introduction**

Plaintiff, Melanie K. Lundstrum ("Lundstrum" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB"). This matter is before me by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 21). For the reasons set forth below, the Court AFFIRMS the Commissioner of Social Security's nondisability finding and DISMISSES Plaintiff's Complaint.

**II. Procedural History**

On September 22, 2020, Claimant filed an application for DIB, alleging a disability onset date of November 23, 2019—the day after an ALJ decision finding her not disabled following previous applications. (ECF No. 9, PageID #: 45). The present application was denied initially and upon reconsideration, and Lundstrum requested a hearing before an administrative law judge ("ALJ"). (*Id.*). On September 20, 2021, an ALJ held a hearing, during which Lundstrum, represented by counsel, and an impartial vocational expert testified. (*Id.*). On October 28, 2021, the ALJ issued a written decision finding Claimant was not disabled. (*Id.* at PageID #: 45-57).

1

The ALJ's decision became final on October 7, 2022, when the Appeals Council declined further review. (*Id.* at PageID #: 33-35).

On December 2, 2022, Claimant filed her Complaint to challenge the Commissioner's final decision. (ECF No. 1). The parties have completed briefing in this case. (ECF Nos. 12, 15, 16). Claimant asserts the following assignments of error:

> (1) The overall decision is not supported by substantial evidence, as the ALJ erred by applying the wrong standard of review when he considered the RFC finding of the prior ALJ to be a mandatory starting point for his analysis of Plaintiff's new application for benefits.
>
> (2) The ALJ erred at Step 4 by not ordering additional opinion evidence when faced with significant objective evidence in forming his RFC; therefore, resulting in an outdated RFC that is not supported by substantial evidence.
>
> (3) The ALJ erred at Step 4 by failing to provide how persuasive he found Ms. Wendy Barnett's opinion to be, as the Court is unable to ascertain whether the ALJ properly considered the supportability and consistency factors in reaching his conclusion.

(ECF No. 12 at 1).

### III. Background

#### A. Previous ALJ Decision

The ALJ summarized the previous ALJ decision:

> As of November 22, 2019, the claimant "alleged disability due to depression, anxiety, sleeping issues, arthritis, left foot issues, hand numbness, high blood pressure, pre-diabetic, acid reflux, and essential tremors," and she reported "walking with a cane more due to worsening arthritis in her knee," which left her "unable to sweep or mop" (Exhibit C1A). The claimant also "testified to debilitating daily headaches," which were "not reflected in the objective medical records," and despite the claimant's reported chronic back, knee, and radiating leg pain, and "history of low back pain going into the bilateral legs," for which she prescribed muscle relaxants and over-the-counter pain medication, exam findings were limited to "myofascial trigger points localized to palpation at the lumbosacral spine," and even these findings were not documented beyond early 2019 (Exhibit C1A). July 2019 found the claimant with a Body Mass Index (BMI) of about 43 and "trace bilateral lower extremity edema," she had "normal joints, … no tremors, [and] a normal gait". The record in November 2019 contained no imaging studies.

2

As "there [were] no diagnostic findings [with regard to the claimant's back and lower extremities," the claimant's previously-assessed inabilities to kneel and crawl were based upon consideration of the effects of her weight and her prescribed use of muscle relaxers (Exhibit C1A).

The claimant previously alleged that carpal tunnel pain and numbness, as well as tremors, often caused her to "drop things," and resulted in her being "unable to do the detailed [sewing] work she [was] used to" (Exhibit C1A). The record, however, showed that upon examination in 2018, the claimant had "diminished sensation to fine touch and pinprick in digits four and five of the left upper extremity," and that nerve conduction studies performed at that time were positive for evidence of "mild" bilateral carpal tunnel neuropathy. The record also showed that in August 2018, the claimant was "helping her roommate build a fence," and that although wrist braces had been recommended at that time, as of November 2019, the claimant had "not yet obtained" those braces (Exhibit C1A).

The remaining evidence indicated that histories of hypertension and the claimant's long-term use of over-the-counter NSAIDs had resulted in an acute kidney injury in May 2019, but there was no further reference to any renal impairment or urinary dysfunction apart from the claimant's well-controlled overactive bladder (Exhibit C1A).

In support of the claimant's prior application, her primary care provider, Vikil Girdhar, M.D., opined, in April 2019, that the claimant "could sit 7 hours, in 30 minute increments, stand 4 hours, in 1-hour increments, lift at the light exertional level, and occasionally grasp, push, pull, perform fine manipulation, operate foot controls, climb, and crawl," and that the claimant could "have no contract with the public or coworkers, that she had "marked to extreme mental limitations," and that she "would be off task 15 percent of the time and would miss more than 3 days of work per month" (Exhibit C1A).

A functional capacity evaluation performed in March 2019, had concluded that the claimant could "perform medium work," but only could only stand for "4 hours total" per workday, and could "only occasionally grossly coordinate, finely coordinate, perform simple grasp, and firmly grasp, and [could] occasionally perform sustained kneeling, crawling, walking, climbing stairs, and balancing statically" (Exhibit C1A).

These assessments were found to lack objective support in the minimal findings of record, and to lack overall support in the claimant's reported and documented activities, while the conclusions of the State agency medical consultants (except that the consultants determined that the claimant could never crawl but could occasionally kneel) were generally adopted, as their conclusions were found to be "persuasive [and] supported by the totality of the evidence, including the objective medical evidence and the claimant's activities of daily living, including caring for many pets" (Exhibit C1A).

3

> With regard to the claimant's mental impairments, the record established through late November 2019 that the claimant received regular mental health care, including medication and counseling, that compliance with this treatment had resulted in affective symptoms that remained generally well controlled and stable, both by report and clinical assessment, and that, according to her treatment notes, the claimant was then "able to function just as effectively as most people" from a mental health perspective (Exhibit C1A).
>
> Considering these findings, and also considering that the record indicated that during a typical day in November 2019, the claimant "smoke[d] cigarettes and marijuana," she lived with a roommate and interacted with friends, her main source of income was donating plasma, and she remained able to drive and to complete routine community shopping and other tasks until her license "was suspended in February 2019 due to a hit and skip fine" that remained unpaid, the claimant's asserted and opined marked and extreme limitations, and inability to remain on task or demonstrate reliable attendance, were found unpersuasive as lacking, again, both objective and overall record support (Exhibit C1A).

(ECF No. 9, PageID #: 52-54).

### B. Relevant Hearing Testimony

The ALJ summarized the relevant testimony from Claimant's hearing:

> The claimant testified that she continues to live with a roommate, that she continues to donate plasma, that she has a driver's license, and that in addition to her high school diploma, she has an Associate's degree in Information Technology. She said that tremors and carpal tunnel symptoms cause her drop things and interfere with her abilities to write, type, and text, and to "open a bottle of pop," but she acknowledged that she continues to read and play games on her smartphone. The claimant asserted that arthritic back and hip pain limited her to sitting for no more than 20 minutes, to standing for no more than 5 minutes, and to lifting/carrying no more than 4 pounds. Although she allowed that she "likes going places," but had stopped "going places" due to the pandemic, she also asserted that she does not like being around people and that she also has difficulty "processing things."

(*Id.* at PageID #: 55).

### C. Relevant Medical Evidence

The ALJ also summarized Claimant's health records and symptoms:

> The current record contains no imaging evidence obtained during the period at issue, and the current record establishes that the claimant did not begin the physical therapy for her reported back and leg pain, which had been recommended years

4

before, until the claim at issue had been denied initially and upon reconsideration, and the record further establishes that when therapy was ultimately discontinued "secondary to non-compliance," the claimant had participated in only 6 sessions (Exhibit C8F).

The record additionally establishes that while x-rays of the claimant's lumbar spine were ultimately performed in September 2021 – just prior to the claimant's October hearing date and a full year after the claimant's date last insured – these imagings were not obtained, as acknowledged by Dr. Girdhar, for any particular diagnostic, treatment, or other medical purpose, but were instead obtained "per [the claimant's] attorney's recommendation" in anticipation of her hearing, as were the claimant's October 2021 EMG/nerve conduction studies, the latter of which still demonstrated only "mild" carpal tunnel syndrome bilaterally (Exhibits C9F, C10F).

The relevant medical evidence currently of record indicates that in January 2020, the claimant remained a "daily" cigarette and marijuana smoker, she had a documented BMI approaching 47, and her 3-month history of cellulitis secondary to "flea bites which cause[d] [her] skin to blister" had "significantly improved," to the claimant's reported "great relief," notwithstanding some residual "+1 pitting edema of the right lower extremity with tenderness to palpation [of] the anterior shin [and] calf" (Exhibit C1F).

Although she was able to access cigarettes and marijuana, the claimant said that she could not afford iron supplements while she complained to Dr. Girdhar in June 2020 that "when she successively donate[d] plasma 3 times," she was reported have decreased hemoglobin and hematocrit levels that "render[ed] her ineligible" for further donations (Exhibit C1F).

Through her date last insured, the claimant voiced neither complaints of back, neck, radiating leg, or knee pain, nor any complaints of carpal tunnel symptoms, and as of July 2020, the claimant had a reported pain level of "zero" (Exhibit C9F).

After her date last insured, and after her request for review of the prior ALJ decision was denied by the Appeals Council and she had filed the application at issue, the claimant returned to Dr. Girdhar in October 2020 with carpal tunnel complaints and with reported "10/10" arthritic pain in her "lumbar spine, bilateral elbows, knees, [and] ankle," secondary to her involvement in a motor vehicle accident at age 13 (Exhibit C9F). Mindful of the lack of evidence noted in the prior decision, the claimant requested wrist braces and referral to physical therapy, but her exam findings remained minimal and limited to a median nerve sensory deficit bilaterally (Exhibit C9F). The claimant was found to maintain full ranges of motion throughout, and she was not seen in initial physical therapy evaluation until April 2021 (Exhibits C98F, C9F). According to Dr. Girdhar, the claimant's September 2021 lumbar x-rays, obtained "to help assist her upcoming disability hearing," were "unremarkable aside from degenerative changes," and the claimant remained only on "Tylenol and tizanidine for pain control" (Exhibit C9F).

(ECF No. 9, PageID #: 54-55). The ALJ discussed Claimant's mental impairments elsewhere in the decision:

> According to the treatment notes of Wendy Barnett, MSN, RN, PMHNP-BC, the claimant's psychiatric prescriber, the claimant in January 2020 reported compliance with her prescribed medication, which she further reported to be "helpful" and "well-tolerated," and despite her "very unkempt and unhygienic" appearance due to a broken water heater, the claimant said that her mood was "stable, … with low anxiety and low depression"; she described her relationship with her female partner as "stable," and she denied having any problems with regard to "sleep, diet, or appetite" (Exhibit C2F). Clinically, the claimant's presentation was essentially unremarkable, with "good attention and concentration with minimal distractibility" and "good awareness of current events and past history," and clinical assessment of the claimant by her counselor later that month remained consistent with these findings (Exhibit C2F).
>
> March 2020 finds the claimant reportedly "depressed about turning 50," and about "her boyfriend forgetting about it," but the claimant had "no[] reported" medical issues, her mood was "euthymic," and her clinical presentation remained essentially unremarkable (Exhibit C2F). In May 2020, the claimant described conflicted relationships with her children and, noting her "lack of utilities," said that her roommate "went to stay at her apartment for a while". The claimant said that she was "living alone with her pets" and maintaining herself, and in June 2020, she reported "doing OK" and occupying her time with "two sets of kittens" and a pregnant cat due "in the next week or so," while also "dying her hair, playing with her pets, and getting outside" (Exhibit C2F). Later that month, during her pandemic-necessitated telehealth visit with NP Barnett, the claimant reported being physically ill with a sore throat and other symptoms, and although the claimant appeared somewhat tangential during her counseling session in July 2020, as she reported relationship issues and "waiting for a decision on her disability [appeal, with regard to the prior ALJ decision]," she said that she continued "to donate plasma for income," and the record indicates that her mood remained "euthymic" (Exhibit C2F).
>
> The claimant was not seen again prior to her September 30, 2020 date last insured, and although the claimant asserts that her mental impairments markedly limited her interactive, attentive, and adaptive functioning during the period at issue, nothing in her treatment notes during that time – or thereafter – supports this assertion (Exhibit C12E).
>
> In October 2020, NP Barnett recorded the claimant to again demonstrate "good" attention and concentration, and to maintain an essentially unchanged and fairly unremarkable clinical presentation, and for her part, the claimant said that she was "doing well" and feeling "very peaceful," as both her roommate and boyfriend were

home with her (Exhibit C2F). The claimant appeared rather tangential, unkempt, and agitated in December 2020, as she described ongoing difficulties with her children, as well as relationship issues with her boyfriend and roommate, but the claimant's March 2021 session with NP Barnett found her reportedly "doing very well," "stay[ing] healthy," "keeping up with her medical appointments," and "getting along well with [her] girlfriend". The claimant said that she had "not had any mood swings," and that her anxiety and depression were "manageable" (Exhibit C5F). Clinically, NP Barnett documented generally unchanged findings, noting again the claimant's "euthymic" mood and "good" attention and concentration, as well as her "good" insight and judgment and intact memory (Exhibit C5F).

In May 2021, NP Barnett discerned some evidence of diminished attention as the claimant reported mourning the loss of her dog and "problems with [her] girlfriends," but the claimant was otherwise recorded to report that she "and her girlfriend [had] 11 cats and [were] happy to take more," that she had no particular "medical issues," and that she "continue[d] to sleep well". In addition, according to the claimant's counseling note that month, the claimant had no chronic medical or infectious conditions that affected her mental health (Exhibits C5F, C7F).

(*Id.* at PageID #: 48-50).

**D. Opinion Evidence at Issue**

On August 19, 2021, Barnett completed a "Mental Impairment Questionnaire." (*Id.* at PageID #: 458-59). Barnett indicated Claimant had "no useful ability to function" in these areas: maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; and accept instructions and respond appropriately to criticism from supervisors. (*Id.* at PageID #: 458). She further indicated Claimant was "unable to meet comparative standards" in the area of "respond appropriately to changes in a routine work setting" and would be "seriously limited, but not precluded" in the area of "get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes." (*Id.*). Barnett listed Claimant has having moderate limitations in understanding, remembering, or

7

applying information and interacting with others; marked limitations in maintaining concentration, persistence, or pace; and extreme limitations in adapting and managing oneself. (*Id.* at PageID #: 459). She opined that Claimant would be absent more than four days per month and would be off task more than 15% of the work day. (*Id.*)

**IV.     The ALJ's Decision**

The ALJ made the following findings relevant to this appeal:

1. The claimant last met the insured status requirements of the Social Security Act on September 30, 2020.

. . .

3. Through the date last insured, the claimant had the following severe impairments: Obesity; lumbar degenerative joint disease; bilateral carpal tunnel syndrome; and depressive, anxiety, and cannabis use disorders (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or a combination of impairments that met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. Through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), with the following limitations: The claimant could never climb ladders, ropes, or scaffolds, she could have no exposure to unprotected heights or hazardous machinery, she could no more than occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl, but she could frequently push, pull, handle, finger, and feel with her upper extremities bilaterally. The claimant was limited to simple, routine tasks not performed at a production rate pace and involving no more than occasional interaction with others; she could not engage in tasks involving arbitration, negotiation, confrontation, directing the work of others, or responsibility for the safety or welfare of others.

6. Through the date last insured, the claimant was unable to perform past relevant work (20 CFR 404.1565).

. . .

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in

8

significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from November 23, 2019, the alleged onset date, through September 30, 2020, the date last insured (20 CFR 404.1520(g)).

(ECF No. 9, PageID #: 47-48, 51, 56-57).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B. Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance

9

benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

### C. Discussion

Claimant raises three issues on appeal. First, Claimant argues the ALJ "erred by applying the wrong standard of review when he considered the RFC finding of the prior ALJ to be a mandatory starting point for his analysis of Plaintiff's new application for benefits." (ECF No. 12 at 8). Second, Claimant argues the RFC is not supported by substantial evidence. (*Id.* at 10). Third, Claimant argues the ALJ "erred by failing to provide how persuasive Wendy Barnett's opinion was." (*Id.* at 13).

**1. The ALJ did not apply the wrong standard of review in considering the prior RFC.**

Claimant argues that the ALJ improperly relied on *Drummond v. Commissioner of Social Security*, 126 F.3d 837, 839 (6th Cir. 1997), and treated the prior RFC as a "mandatory starting

point" in his analysis, contrary to the Sixth Circuit's subsequent guidance in *Earley v. Commissioner of Social Security*, 893 F.3d 929 (6th Cir. 2018). (ECF No. 12 at 8-9). Claimant asserts that "[d]espite the ALJ discussing subsequent developments in the record," he relied on the State agency consultants' opinions "that all relied on *Drummond* to adopt the prior ALJ's residual functional capacity finding," and this reliance combined with "his use of the word 'must' in relation to the consideration of prior findings indicates ambiguity regarding whether the ALJ reviewed the evidence with a 'fresh look' as required by *Earley* or whether he applied principles of res judicata using the *Drummond* standard." (*Id.* at 9-10).

The Commissioner responds that "despite citing to *Drummond* on the first page of his decision, the ALJ proceeded to find that changed regulatory standards meant that he was not, in fact, bound by the prior ALJ's findings;" evaluate Plaintiff's new claim, 'including the relevant record evidence both before and after the ALJ decision;" and adopt an RFC "that was not identical to either the RFC in the prior administrative medical findings, or to the RFC determined by the prior ALJ" such that he gave the claim a "fresh look" as required by *Earley*. (ECF No. 15 at 12-13). The Commissioner argues that "an ALJ's comment that a prior ALJ's findings can be 'binding' in certain circumstances can be harmless in an *Earley* case, when the ALJ nonetheless gives a 'fresh look' to the new application and evidence." (*Id.* at 14).

Claimant replies that the ALJ "did not indicate that the legal standards changed how he viewed the evidence as dictated by *Earley*." (ECF No. 16 at 1). She argues that her medical records show worsening conditions compared to her previous claim which were "not accurately accounted for by the ALJ and should not have resulted in an RFC that was less restrictive than the previous decision." (*Id.* at 2). Claimant argues that because the ALJ relied on the State agency consultants' opinions—which relied on the prior RFC— "the Court cannot evaluate the Plaintiff's

11

medical history to determine whether the facts support the RFC independent of the ALJ's reliance on *Drummond*." (*Id.* at 3).

In *Drummond*, the Sixth Circuit stated that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." 126 F.3d at 842. However, in *Earley*, the Sixth Circuit clarified that *Drummond* should not be read to hold that an ALJ is *always* bound by a previous disability determination. 893 F.3d at 932. Rather, "[a]n individual may file a second application—for a new period of time—for all manner of reasons and obtain independent review of it so long as the claimant presents evidence of a change in condition or satisfies a new regulatory threshold." *Id.* However, the *Earley* court noted that "[f]resh review is not blind review. A later administrative law judge may consider what an earlier judge did if for no other reason than to strive for consistent decision making." *Id.* at 934.

Here, the ALJ expressly stated that "except as otherwise noted for the reasons cited, the undersigned has not adopted the findings of the prior decision herein." (ECF No. 9 at PageID #: 46). In discussing Claimant's mental limitations, the ALJ did ultimately conclude "that the prior administrative findings [were] well-supported, and thus both probative and persuasive." (*Id.* at PageID #: 50). However, he did so only after reviewing medical records from after the last decision—which included mostly unremarkable findings—and concluding there was "no evidence of manifest change in the claimant's mental functioning, and specifically, no evidence of marked to extreme limitations." (*Id.*). Further, in addressing each area of limitation, the ALJ noted the findings of the prior decision and provided specific explanation as to why the same finding was still appropriate based on the current record. (*Id.* at PageID #: 50-51). As to the physical limitations, the ALJ was "less persuaded" by the State agency consultants' conclusion that there

was "no new and material evidence warranting a change in the claimant's residual functional capacity." (*Id.* at PageID #: 55). Specially, the ALJ noted that "through the date last insured, there is no objective evidence that spinal or extremity dysfunction precluded the claimant from kneeling;" "claimant's prescribed use of muscle relaxants in combination with her weight and accompanying arthritis would reasonably limit the claimant to occasional rather than frequent balancing maneuvers;" and "the lack of evidence of greater left upper extremity dysfunction, as compared to functioning on the right, reasonably supports finding the claimant's upper extremity limitations equal bilaterally." (*Id.*).

The Court agrees with the Commissioner that the ALJ did not treat the prior decision as a mandatory starting point. Rather, the ALJ found the prior decision persuasive and relied on it to the extent he found it consistent with the medical records for the relevant time. The ALJ's detailed discussion of the medical records for the time after the previous decision and his discussion of why such supported his adoption of an RFC that ultimately differed from that in the prior decision show that the ALJ provided the fresh look required by *Earley*. Thus, the ALJ did not err.

**2. The RFC is supported by substantial evidence.**

Claimant next argues that "the ALJ failed to utilize the tools necessary under the regulation and order additional opinion evidence when faced with significant objective evidence to form his RFC" and "[d]ue to these errors, the ALJ's RFC and overall decision is not supported by substantial evidence." (ECF No. 12 at 10). Claimant asserts that the "last time a medical doctor reviewed all of the evidence and provided an opinion was on 4/15/21" and "[a]t that time, less than half of the medical records were available." (*Id.* at 11). Claimant points to exams from October 2020 through October 2021 and argues an ALJ "should not be allowed to interpret these sort[s] of objective examinations and medical imaging." (*Id.* at 11-12).

13

The Commissioner responds that Claimant's argument should be rejected because "the state agency reviewers reviewed the record evidence as of April 2021—seven months after Plaintiff's date last insured" and any evidence "after the date last insured is generally of little probative value." (ECF No. 15 at 16). To the extent Claimant's argument relies on *Deskin v. Commissioner of Social Security*, 605 F. Supp. 2d 908 (N.D. Ohio 2008), the Commissioner "requests that this Court decline to follow *Deskin* and its progeny, as that caselaw is unsupported by the language of the Act and the Commissioner's regulations and is inconsistent with Sixth Circuit caselaw." (*Id.*). Even if the Court follows *Deskin*, the Commissioner argues remand is not warranted because Claimant "failed to even attempt to demonstrate that there is more than a speculative possibility that the outcome would be different." (*Id.* at 19). Finally, the Commissioner argues that the records Claimant highlights "consist of treatment notes showing mild carpal tunnel syndrome and lumbar back pain, almost entirely unremarkable mental health counseling notes, six physical therapy treatment notes, and a single EMG test that was interpreted by a radiologist as showing mild carpal tunnel syndrome" and "[t]his is precisely the kind of medical evidence that an ALJ is tasked in assessing in order to render his RFC." (*Id.* at 20).

Claimant essentially argues that because State agency consultants did not review all her medical records, the ALJ's RFC was not supported by substantial evidence. The Court disagrees. As this Court has previously recognized,

> "There is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record." *Robinson v. Comm'r of Soc. Sec. Admin.*, No. 5:14-CV-291, 2015 WL 1119751, at *11 (N.D. Ohio Mar. 11, 2015). "The opinions need only be 'supported by evidence in the case record.'" *Id.* (quoting *Helm v. Comm'r of Soc. Sec. Admin.*, 405 F. App'x 997, 1002 (6th Cir. 2011)). Indeed, "it is not error for an ALJ to rely on medical opinions from physicians who have not reviewed the entire record so long as the ALJ considers the post-dated evidence in formulating her opinion." *Edwards v. Comm'r of Soc. Sec.*, No. 1:17 CV 925, 2018 WL 4206920, at *6 (N.D. Ohio Sept. 4. 2018) (citing *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009)

14

> (indicating that an ALJ's reliance upon state agency reviewing physicians' opinions that were outdated was not error where the ALJ considered the evidence developed post-dating those opinions)).

*Langford v. Comm'r of Soc. Sec.*, No. 1:22-CV-006565-CEH, 2023 WL 3058160, at *24 (N.D. Ohio Apr. 24, 2023). Additionally, "[e]vidence of disability obtained after the expiration of insured status is generally of little probative value. Indeed, post-date-last-insured medical evidence generally has little probative value unless it illuminates the claimant's health before the insurance cutoff date." *Grisier v. Comm'r of Soc. Sec.*, 721 F. App'x 473, 477 (6th Cir. 2018) (citations omitted).

Here, except for an October 2020 exam, the evidence Claimant cites as not being properly considered by the State agency consultants is from over six months after her date last insured and contains notes and observations from those individual visits. (*See* ECF No. 12 at 11-12). Thus, as the Commissioner argues, this evidence has little probative value because it does not illuminate Claimant's health before the September 30, 2020 date last insured. Additionally, while the State agency consultants did not review this additional evidence, they did review the only evidence in the record concerning the time prior to Claimant's date last insured. (*See* ECF No. 9 at PageID #: 121-22, 129-30). Further, the ALJ cited to and discussed each of the additional records and opined that while they were "not particularly relevant or probative" as to Claimant's condition during the relevant time period, they did not support greater limitations than those included in the RFC based on Claimant's own reports to her mental health provider of "doing well;" x-rays that were "not obtained . . . for any particular diagnostic, treatment, or other medical purpose, but were instead obtained 'per the claimant's attorney's recommendation'" but still demonstrated only "mild" carpal tunnel;" and Claimant's report of zero pain in July 2020 followed by her report of "10/10" pain in October 2020, following the Appeals Council's denial of her previous claim, while she still

15

maintained "full ranges of motion throughout." (*Id.* at PageID #: 50, 54-55).

Because the ALJ fully considered the relevant evidence in formulating the RFC, he did not err in failing to obtain an additional opinion. Further, substantial evidence supports the ALJ's RFC. To the extent Claimant argues the additional records may support an alternate conclusion concerning her impairments, the Court must defer to the ALJ's decision "even if there is substantial evidence that would have supported an opposite conclusion[.]'" *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

### 3. Any error by the ALJ in failing to specifically designate the persuasiveness of Wendy Barnett's opinion was harmless.

Claimant argues the "ALJ failed to appropriately provide how persuasive Wendy Barnett's opinion was" and such error cannot be excused as harmless. (ECF No. 12 at 13-14). The Commissioner responds that "[w]hile Plaintiff is correct that the ALJ here did not expressly state that Ms. Barnett's opinion was 'not persuasive,' a review of the decision shows that any such error was harmless because there can be no question that the ALJ found Ms. Barnett's opinion not persuasive." (ECF No. 15 at 21). The Commissioner relies on the ALJ's statement that "nothing in Ms. Barnett's treatment notes—or in the totality of the evidence—supports her August 2021 opinion that claimant's mental impairments caused marked attentive limitations and extreme limitations in adaption/symptom management" and the ALJ's explanation of how specific record evidence contradicted Ms. Barnett's opinions concerning Claimant's limitations. (*Id.* at 21-22). Claimant replies that "there is an argument to be made that Ms. Barnett's opinion could be found persuasive" such that "[a]t a minimum, there is a confusion on how persuasive the ALJ found Ms. Barnett's opinion to be" and "without a clear conclusion, the Court is unable to ascertain whether the ALJ properly considered the supportability and consistency factors in reaching that conclusion." (ECF No. 16 at 5-6 (citing *Sparks v. Kijakazi*, No. 2:21-CV-102-DCP, 2022 WL

16

4546346, at *8 (E.D. Tenn. Sept. 28, 2022)).

At Step Four, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(e). For claims filed after March 27, 2017, the regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." 20 C.F.R. § 404.1520c(a). Nevertheless, an ALJ must "articulate how [he] considered the medical opinions and prior administrative medical findings" in adjudicating a claim. *Id.* Medical source opinions are evaluated using the factors listed in § 404.1520c(c). The factors include supportability; consistency; the source's relationship with the claimant; the source's specialized area of practice, if any; and "other factors that tend to support or contradict a medical opinion." *Id.* at § 404.1520c(c). The ALJ is required to explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. *Id.* at § 404.1520c(b)(2).

While the ALJ did not expressly discuss Barnett's opinion in his Step Four analysis, his discussion at Step Three makes clear that he considered Barnett's opinion. *See Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014) (courts look at an ALJ's decision "as a whole" when determining if it complies with the regulations). Claimant is correct that the ALJ did not explicitly indicate how persuasive he found Barnett's opinion. Relying on *Lorrain R. v. Commissioner of Social Security*, No. 3:20-cv-00396, 2022 WL 4232839, at *5 (S.D. Ohio Sept. 14, 2022), Claimant argues that "[s]uch an error cannot be excused as harmless for other reasons, including where substantial evidence in the record may support the ALJ's conclusion regarding the persuasiveness (or lack thereof) of the medical opinion." (ECF No. 12 at 14). However, in *Lorraine*, the issue was not an ALJ's failure to indicate how persuasive he found an opinion but

17

rather his "failure to explain his consideration of the supportability and consistency factors when determining the persuasiveness of a medical opinion." 2022 WL 4232839, at *5. The Court determined that failure to address these required factors could only be excused as harmless error if "(1) the medical opinion is patently deficient, (2) the ALJ adopted the medical opinion or made findings consistent with the opinion, or (3) the goal of the regulation was otherwise met." *Id*.

Unlike in *Lorrain*, the ALJ here adequately addressed the supportability and consistency factors. In considering Barnett's opinion, the ALJ detailed Barnett's own records from January 2020 until May 2021, highlighting visits where Claimant was "stable, … with low anxiety and low depression" and observed with "euthymic" mood," and found that "nothing in her treatment notes – or in the totality of the evidence – supports NP Barnett's August 2021 opinion that the claimant's mental impairments cause marked attentive limitations and extreme limitations in adaptation/symptom management." (*Id.* at PageID #: 50). T ECF No. 9 at PageID #: 49-50). The observation that nothing in Barnett's treatment notes supported her opinion shows that the ALJ properly considered the supportability of the opinion. 20 C.F.R. § 404.1520c(c) ("The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medial opinions or prior administrative medical finding(s) will be."). The ALJ's additional observation that Barnett's opinion was also not supported by "the totality of the evidence" shows that he considered consistency. *Id.* ("The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.").

The ALJ's decision makes clear that he found Barnett's opinion unsupported by the record

and inconsistent with the record. Therefore, the ALJ's decision builds a logical bridge to demonstrate that he found Barnett's opinion unpersuasive after properly considering the supportability and consistency factors. Substantial evidence supports that decision. Thus, the Court concludes that any error by the ALJ in failing to explicitly indicate he found the opinion unpersuasive was harmless.

### VI. Conclusion

Based on the foregoing, the Court AFFIRMS the Commissioner of the Social Security Administration's final decision denying to Plaintiff disability insurance benefits. Plaintiff's Complaint is DISMISSED.

Dated: November 8, 2023

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE